FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2017 MAY 30 P 2: 51

CLERK'S OFFICE
AT GREENBELT

BY____

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

JAMES HUYNH,

    Plaintiff,

v.                                  Case No.: GJH-14-1625

KODZO MASSENYA, *et al.*,

    Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

Plaintiff James Huynh brings this action against the Gabonese Republic ("Gabon") and three individuals, Kodzo "Michael" Massenya, Charles Mbonke, and Jean LeGrand, for conversion, fraud, and civil conspiracy. ECF No. 1. Presently pending before the Court is Plaintiff's Motion for Default Judgment against Defendant Gabon. ECF No. 32. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2016). For the following reasons, the Motion for Default Judgment is denied.

**I.    BACKGROUND**[1]

Huynh is a Virginia resident and at times relevant to the action, owned approximately four acres of land in Fairfax, Virginia. ECF No. 1 ¶¶ 1, 8. Huynh was working at a Jaguar and Land Rover/Range Rover car dealership in Rockville, Maryland in January 2010, when he met Defendant Jean LeGrand. *Id.* ¶ 10. To the best of Plaintiff's knowledge and belief, LeGrand is a resident of Montgomery County, Maryland. *Id.* ¶ 6. LeGrand visited the Jaguar dealership approximately fifteen times between January 2010 and October 2010, purchasing two vehicles

---

[1] The background facts are taken from Plaintiff's Complaint, ECF No. 1.

during that time. *Id.* ¶¶ 10–11. In August 2010, Huynh also met Defendant Kodzo Massenya when Massenya visited the dealership. *Id.* ¶ 12. To the best of Plaintiff's knowledge and belief, Massenya is a resident of the United Kingdom. *Id.* ¶ 4. Massenya represented himself as being wealthy to Huynh and expressed interest in Huynh's Fairfax land. *Id.* ¶ 13. Massenya told Huynh that he knew someone from Gabon — the son of the late President of Gabon, in particular — who would be interested in purchasing Huynh's land. *Id.* ¶ 14. On or about January 3, 2011, Massenya introduced Huynh to Defendant Charles Mbonke at the Bethesda Marriott Suites in Bethesda, Maryland. *Id.* ¶ 15. To the best of Plaintiff's knowledge and belief, Mbonke is a resident of Gabon and/or France. *Id.* ¶ 5. Mbonke introduced himself to Huynh as the son of the late Gabonese President, Omar Bongo Ondimba. *Id.* ¶ 16. According to Plaintiff, Mbonke also stated that he was working on behalf of the government of the Gabonese Republic and serving as a Delegate from Gabon to the United Nations. *Id.* ¶¶ 17–18. Mbonke allegedly showed Huynh what appeared to be a diplomatic passport from the Gabonese Republic in Mbonke's name. *Id.* ¶ 18. Huynh found Mbonke to be "well-spoken, well-dressed and politically informed." *Id.* ¶ 16.

Huynh again met Defendants Mbonke and Massenya at the Bethesda Marriott on January 19, 2011. ECF No. 1 ¶ 19. During this meeting, Mbonke allegedly told Huynh how money could be "legally printed" using "specially-produced white paper" from the United States Treasury and specific chemicals. *Id.* ¶ 20. Mbonke and Massenya told Huynh that this special white paper was transported from the U.S. Treasury to the government of Gabon, and that this process was "officially sanctioned" by both governments. *Id.* ¶ 21. Mbonke said that he had some of this white paper in his possession, with authorization from the Gabonese government to use it. *See id.* ¶ 22. Mbonke and Massenya allegedly demonstrated to Huynh how they could turn the white paper into bona fide U.S. currency. *Id.* ¶ 23. Mbonke and Massenya asked Huynh for $800,000,

which they would use to convert the white paper, double his sum of $800,000, and pay Huynh for his land. *See id.* ¶ 24. Huynh agreed, and withdrew $800,000 from his bank account on May 16, 2011. *Id.* ¶ 25. Huynh gave Mbonke and Massenya $500,000 of the funds, and turned over the remaining $300,000 soon thereafter. *Id.* ¶¶ 27–31.

On May 19, 2011, Huynh went with Mbonke and Massenya to a residence in Laurel, Maryland, which Massenya represented to be Massenya's uncle's house. ECF No. 1 ¶ 30. Mbonke and Massenya told Huynh they were going to turn the white paper into real money, and instructed him to wait in another room. *Id.* ¶ 33. Eventually, Mbonke and Massenya told Huynh that the white paper had a undesirable pinkish tint on it, and that they would need additional chemicals to get rid of the tint. *Id.* ¶ 34. Huynh did not actually see any of the money during this time. *Id.* ¶ 35. Mbonke and Massenya told Huynh that they would allow him to hold onto his money and the white paper money for the time being. *Id.* ¶ 35. Massenya and Huynh went to purchase two safes from a Staples supply store, which Massenya and Mbonke said they would use to store the money. *Id.* ¶ 37. Massenya and Mbonke told Huynh that Huynh could keep the safe and the money while Mbonke traveled to Paris to retrieve the necessary chemicals, and Mbonke would hold onto the combination and the keys. *Id.* ¶¶ 38–40.

Massenya and Mbonke told Huynh that the chemicals would cost an additional $250,000, of which Mbonke and Massenya would pay $170,000, ECF No. 1 ¶ 42–43, and Huynh would need to pay the remaining $80,000. *Id.* ¶ 44. Huynh agreed to take out the cash. *See id.* ¶ 49. According to Plaintiff, Mbonke then arranged a meeting between Massenya, Huynh, and an "agent from a Canadian chemical company." *Id.* ¶ 45. On July 10, 2011, Massenya and Huynh went to Reagan National Airport in Crystal City, Virginia to meet the agent. *Id.* ¶ 46. Massenya went inside the airport to get the "Canadian chemical agent," and brought him back out to the car

3

where Huynh was waiting. *Id.* ¶ 48. Massenya, Huynh, and the agent discussed the cost of the chemicals for approximately ten minutes, and Huynh then transferred his $80,000 into the agent's backpack. *Id.* ¶ 49. Plaintiff Huynh believes the identity of the Canadian chemical agent to actually be Defendant LeGrand, who had visited the Jaguar dealership the year prior. *Id.* ¶ 50.

Several days later, Mbonke called Huynh and said that the chemical company had received part of the funds for the chemicals, and that Mbonke would return from Paris and drive to Canada with the rest of the funds. ECF No. 1 ¶ 51. However, on July 16, 2011, Mbonke called again and told Huynh that while Mbonke was driving from the United States to Canada, he was pulled over for speeding. *Id.* ¶ 52. Mbonke said that he was detained for 48 hours, that U.S. Customs had confiscated all the money and chemicals, and that Mbonke had been sent back to France, forbidden from returning to the United States for at least six months. *Id.* ¶ 52. Mbonke asked Huynh to inform Massenya of what had happened. *Id.* ¶ 53. Huynh met with Massenya one more time on July 20, 2011. *Id.* ¶ 54. While Mbonke and Massenya have allegedly maintained telephone contact with Huynh, Huynh has never seen them again. *Id.* ¶ 56.

Huynh filed the instant Complaint on May 19, 2014 against the Gabonese Republic, Kodzo Massenya, Charles Mbonke, and Jean LeGrand, alleging conversion, fraud, and civil conspiracy. ECF No. 1. Defendant Massenya, the only Defendant upon whom service was effectuated, was served on September 9, 2014. ECF No. 10. None of the Defendants has entered an appearance in this matter. Plaintiff moved for default judgment against Defendant Massenya on January 12, 2015, but the Court denied the Motion pursuant to Fed. R. Civ. P. 54(b), which governs judgment against multiple defendants. ECF No. 18. The Court found that there was "just reason for delay" for the entry of default against one Defendant, until the other Defendants were

4

served and the matter adjudicated as to all Defendants. *Id.* at 2.[2] Plaintiff allegedly continued his efforts to serve the remaining Defendants, but as of June 2, 2016, summons were still unexecuted as to Jean LeGrand and Charles Mbonke.

However, on September 1, 2016, Plaintiff filed a Proof of Service stating that the U.S. Embassy in Libreville, Gabon, had transmitted the summons, complaint, notice of suit, and translations to the Ministry of Foreign Affairs of the Gabonese Republic on August 23, 2016. ECF No. 29 at 1; ECF No. 29-1 at 4. Following want of answer or other defense, the Clerk of the Court entered default upon Plaintiff's motion on January 26, 2017. ECF No. 30; ECF No. 31. Plaintiff has now moved for default judgment against the Gabonese Republic. ECF No. 32. Because the Court finds that Plaintiff has not demonstrated proper subject matter jurisdiction under the Foreign Sovereign Immunities Act (FSIA), nor established his right to relief by evidence satisfactory to the Court, his motion for default judgment against Gabon will be denied.

## II. ANALYSIS

### A. Jurisdiction under FSIA

The Court must determine the existence of subject matter jurisdiction before proceeding to the merits of a claim. *See Jones v. Am. Postal Workers Union*, 192 F.3d 417, 422 (4th Cir. 1999). The Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.*, codified in part at 28 U.S.C. § 1330 provides that:

> The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.

---

[2] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

5

28 U.S.C. § 1330(a). 28 U.S.C. § 1605 sets forth the general exceptions to the jurisdictional immunity of a foreign state. Section 1605(a)(5), the only exception upon which Plaintiff relies, *see* ECF No. 1 ¶ 2, provides in relevant part that:

> (5) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which money damages are sought against a foreign state for . . . damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to--
> (A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or
> (B) any claim arising out of . . . misrepresentation [or] deceit . . .

28 U.S.C. § 1605(a)(5). This exception has been called the "non-discretionary torts" exception, *see Robinson v. Gov't of Malaysia*, 269 F.3d 133, 139 (2d Cir. 2001), or the "tortious act" exemption, *see Youming Jin v. Ministry of State Sec.*, 475 F. Supp. 2d 54, 63 (D.D.C. 2007).

Once a defendant has made a prima facie showing that it is a foreign state, or it is evident from the pleadings that the defendant is a foreign state, *see Abdulla v. Embassy of Iraq at Washington, DC*, No. CIV.A. 12-2590, 2013 WL 4787225, at *2 (E.D. Pa. Sept. 9, 2013), *aff'd*, 598 F. App'x 824 (3d Cir. 2015), plaintiff bears the burden of offering evidence that an exception to foreign sovereign immunity applies. *See Velasco v. Gov't Of Indonesia*, 370 F.3d 392, 397 (4th Cir. 2004); *Gerding v. Republic of France*, 943 F.2d 521, 525 (4th Cir. 1991) (noting that "burden of going forward would shift to the plaintiff to produce evidence establishing that the foreign state is not entitled to immunity"); *Pradhan v. Al-Sabah*, 299 F. Supp. 2d 493, 497 (D. Md. 2004) (summarizing cases). "In assessing whether the plaintiff has sufficiently alleged or proffered evidence to support jurisdiction under the FSIA, a district court must review the allegations in the complaint, [and] the undisputed facts, if any . . ." *Robinson v.*

*Gov't of Malaysia*, 269 F.3d 133, 141 (2d Cir. 2001). Before applying the tortious act exception, "the court must first determine whether the alleged acts constitute tortious acts and second, whether the defendant actors committed those tortious acts while acting within the scope of their employment." *Youming Jin v. Ministry of State Sec.*, 475 F. Supp. 2d 54, 63 (D.D.C. 2007).

The Gabonese Republic is a foreign state within the meaning of § 1603(a). Thus, the burden shifts to Plaintiff to offer evidence demonstrating that an exception to the FSIA applies. As for Plaintiff's fraud claim, fraud by definition requires misrepresentation or deceit, *see Lane v. United States*, 286 F.3d 723, 731 (4th Cir. 2002), *Doe v. U.S. ex rel. U.S. Dep't of Health & Human Servs.*, No. CIV.A. TDC-14-1441, 2015 WL 1461236, at *4 (D. Md. Mar. 27, 2015), *aff'd sub nom.*, *Doe v. United States*, 610 F. App'x 291 (4th Cir. 2015) (noting that fraud claims are unavailable against the government under Federal Tort Claims Act because fraud is grounded in the tort of misrepresentation), and is therefore not a part of the tortious act exception under the FSIA, *see* 28 U.S.C. § 1605(a)(5)(B).

Regarding Plaintiff's claims of conversion and civil conspiracy, Plaintiff fails to provide any evidence whatsoever, save his own bare assertions, that Defendant Mbonke was an official or employee of Gabon and was acting in the scope of his employment at the time of the alleged torts. Plaintiff alleges in the Complaint that when he met Charles Mbonke, Mbonke claimed to be working on behalf of the Gabonese Republic and showed Plaintiff his diplomatic passport. ECF No. 1 ¶¶ 17–18. Plaintiff also claims that Mbonke told him that the money conversion process was "officially sanctioned by both governments." *Id.* ¶ 21. Even taking these allegations as true, Plaintiff does not allege that what appears to be a private business deal between Defendant Mbonke and Plaintiff was in fact conducted in the scope of Mbonke's employment as a "Delegate from Gabon to the United Nations." ECF No. 1 ¶ 14. The single affidavit submitted

in support of Plaintiff's Motion for Default Judgment further fails to support jurisdiction, and merely discusses that waiver of sovereign immunity does not apply. ECF No. 32 at 4–5. This, without more, is insufficient to allege a "tortious act or omission" caused by Gabon or an official or employee of Gabon acting within the scope of his employment required to sustain jurisdiction under the FSIA. *See Robinson v. Gov't of Malaysia*, 269 F.3d 133, 144–46 (2d Cir. 2001) (finding that allegations in the complaint not sufficient to establish non-discretionary tort exception under FSIA); *Jin v. Ministry of State Sec.*, 557 F. Supp. 2d 131, 140 (D.D.C. 2008) (finding that plaintiffs had failed to substantiate that commercial activity exception applied).

### B. Default Judgment against Foreign States

Even if the allegations could be read to establish the tortious act exception to foreign sovereign immunity, Plaintiff has not cleared the hurdle for default judgment against a foreign state as set forth at 28 U.S.C. § 1608(e):

> No judgment by default shall be entered by a court of the United States . . . against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court.

28 U.S.C. § 1608(e). To satisfy this requirement, Plaintiff must "provide satisfactory evidence as to each element of the claim upon which relief is sought." *Abdulla v. Embassy of Iraq at Washington, DC*, No. CIV.A. 12-2590, 2013 WL 4787225, at *7 (E.D. Pa. Sept. 9, 2013), *aff'd*, 598 F. App'x 824 (3d Cir. 2015) (citing *Compania Interamericana Export–Import, S.A. v. Compania Dominicana de Aviacion*, 88 F.3d 948, 951 (11th Cir. 1996)) (internal alterations omitted); *see also Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 838 (D.C. Cir. 2009) (observing that a plaintiff is not automatically entitled to judgment when a foreign state defaults, and that court must be satisfied that plaintiff has established right to relief). Plaintiff does not bear the "burden of producing the full range of evidence that would be available to them if the

opposing party had participated in discovery," but rather, the Court may be satisfied with a "quantum and quality of evidence . . . less than that normally required." *Ohntrup v. Makina*, No. CIV. 76-742, 1993 WL 315636, at *4 (E.D. Pa. Aug. 18, 1993).

Here, Plaintiff relies on the allegations of his Complaint, as well as one affidavit from his attorney attached to the Motion for Default Judgment. Applying Maryland law, *see Williams v. Romarm S.A.*, 116 F. Supp. 3d 631, 637 n.2 (D. Md. 2015) (noting that courts have held that once a foreign state is properly sued under FSIA, the forum state's choice-of-law rules apply), "[c]onversion is an intentional tort, consisting of two elements, a physical act combined with a certain state of mind. The physical act can be summarized as 'any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it.'" *Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 249, 261 (2004) (citations omitted). The requisite state of mind is "an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights." *Id.* at 262.

In support of the claim of conversion, Plaintiff alleges that "Defendant Gabon did aid and assist in the commission of Defendant Mbonke's exercise of dominion and control over the $880,000 rightfully belonging to Plaintiff by providing the white-paper to Defendant Mbonke and by authorizing Defendant Mbonke to act on its behalf." ECF No. 1 ¶ 61.[3] However, Plaintiff has provided no evidence from which the Court could conclude that Gabon actually provided the "white paper" to Defendants, or had any role in these transactions whatsoever. Plaintiff has also failed to submit any evidence demonstrating that Defendant Mbonke was acting as "an agent" of Gabon, beyond his claim that Mbonke showed Huynh a diplomatic passport and told Huynh, falsely, that the Gabonese government had sanctioned the conversion of white paper into real

---

[3] The affidavit submitted by Christopher L. Markham, Plaintiff's attorney, does not address the conversion claim, nor does it address any of Plaintiff's other claims. ECF No. 32.

currency. *See* ECF No. 1 ¶¶ 18, 21. Thus, in effect, the only "evidence" of Gabon's involvement is that which was offered to Plaintiff by those alleged to have committed an elaborate fraud. Moreover, "[m]ere conclusory allegations of possible second-degree influence" and "unsubstantiated suspicions" are insufficient to satisfy the Court that Plaintiff is entitled to relief. *See Jin v. Ministry of State Sec.*, 557 F. Supp. 2d 131, 144–45 (D.D.C. 2008) (finding that plaintiff's evidence in FSIA case did not satisfactorily establish contractual interference, and therefore denying motion for default judgment).

Plaintiff has also alleged that Defendant Mbonke acted as an "agent of Gabon," in support of the other claims of fraud and civil conspiracy. *Id.* ¶¶ 66, 67, 75. However, since the other tort claims have failed, civil conspiracy, which merely alleges an agreement between two or more persons to commit the tortious acts, must also fail. *See Fischer v. Longest*, 99 Md. App. 368, 382 (1994) (affirming dismissal of conversion and conspiracy claims); *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 336 Md. 635, 645 (1994) (explaining that conspiracy "is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiffs"). In sum, Plaintiff has not established his right to relief by evidence satisfactory to the Court, and for that additional reason, his motion for default judgment against the Gabonese Republic will be denied.

### III. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Default Judgment, ECF No. 32, is denied. However, Plaintiff will be permitted to file a renewed Motion for Default Judgment related to Defendant Massenya. A separate Order shall issue.

Date: May 30, 2017

GEORGE J. HAZEL
United States District Judge