IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2017 NOV 13 P 4: 49

CLERK'S OFFICE
AT GREENBELT

JAMES HUYNH,

    Plaintiff,

v.                                         Case No.: GJH-14-1625

KODZO MASSENYA, *et al.*,

    Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiff James Huynh brought this action against the Gabonese Republic ("Gabon") and three individuals, Kodzo "Michael" Massenya, Charles Mbonke, and Jean LeGrand, for conversion, fraud, and civil conspiracy. ECF No. 1. Since then, this Court dismissed Gabon as a defendant, ECF No. 36 ¶ 2, and Huynh voluntarily dismissed Mbonke and LeGrand as defendants, ECF No. 37. Presently pending before the Court is Plaintiff's Motion for Default Judgment against Defendant Massenya. ECF No. 39. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2016). For the following reasons, the Motion for Default Judgment is granted in part and denied in part.

### I.    BACKGROUND[1]

The Court laid out the facts of this case in its May 30, 2017 Memorandum Opinion, ECF No. 33, but restates the relevant facts here. Huynh is a Virginia resident and at all times relevant to the action owned approximately four acres of land in Fairfax, Virginia. ECF No. 1 ¶¶ 1, 8. Huynh was working at a Jaguar and Land Rover/Range Rover car dealership in Rockville,

---

[1] The background facts are taken from Plaintiff's Complaint, ECF No. 1.

Maryland in January 2010, when he met Defendant Jean LeGrand. *Id.* ¶ 10. LeGrand visited the Jaguar dealership approximately fifteen times between January 2010 and October 2010, purchasing two vehicles during that time. *Id.* ¶¶ 10–11. In August 2010, Huynh also met Defendant Kodzo Massenya when Massenya visited the dealership. *Id.* ¶ 12. To the best of Plaintiff's knowledge and belief, Massenya is a resident of the United Kingdom. *Id.* ¶ 4. Massenya that he was wealthy and expressed interest in Huynh's Fairfax land. *Id.* ¶ 13. Massenya told Huynh that he knew someone from Gabon — the son of the late President of Gabon, in particular — who would be interested in purchasing Huynh's land. *Id.* ¶ 14. On or about January 3, 2011, Massenya introduced Huynh to Defendant Charles Mbonke at the Bethesda Marriott Suites in Bethesda, Maryland. *Id.* ¶ 15. To the best of Plaintiff's knowledge and belief, Mbonke is a resident of Gabon and/or France. *Id.* ¶ 5. Mbonke introduced himself to Huynh as the son of the late Gabonese President, Omar Bongo Ondimba. *Id.* ¶ 16. According to Plaintiff, Mbonke also stated that he was working on behalf of the government of the Gabonese Republic and serving as a Delegate from Gabon to the United Nations. *Id.* ¶¶ 17–18. Mbonke allegedly showed Huynh what appeared to be a diplomatic passport from the Gabonese Republic in Mbonke's name. *Id.* ¶ 18. Huynh found Mbonke to be "well-spoken, well-dressed and politically informed." *Id.* ¶ 16.

Huynh again met Defendants Mbonke and Massenya at the Bethesda Marriott on January 19, 2011. ECF No. 1 ¶ 19. During this meeting, Mbonke allegedly told Huynh how money could be "legally printed" using "specially-produced white paper" from the United States Treasury and specific chemicals. *Id.* ¶ 20. Mbonke and Massenya told Huynh that this special white paper was transported from the U.S. Treasury to the government of Gabon, and that this process was "officially sanctioned" by both governments. *Id.* ¶ 21. Mbonke said that he had some of this

2

white paper in his possession, with authorization from the Gabonese government to use it. *See id.* ¶ 22. Mbonke and Massenya allegedly demonstrated to Huynh how they could turn the white paper into bona fide U.S. currency. *Id.* ¶ 23. Mbonke and Massenya asked Huynh for $800,000, which they would use to convert the white paper, double his sum of $800,000, and pay Huynh for his land. *See id.* ¶ 24. Huynh agreed, and withdrew $800,000 from his bank account on May 16, 2011. *Id.* ¶ 25. Huynh gave Mbonke and Massenya $500,000 of the funds, and turned over the remaining $300,000 soon thereafter. *Id.* ¶¶ 27–31.

On May 19, 2011, Huynh went with Mbonke and Massenya to a residence in Laurel, Maryland, which Massenya represented to be Massenya's uncle's house. ECF No. 1 ¶ 30. Mbonke and Massenya told Huynh they were going to turn the white paper into real money, and instructed him to wait in another room. *Id.* ¶ 33. Eventually, Mbonke and Massenya told Huynh that the white paper had a undesirable pinkish tint on it, and that they would need additional chemicals to get rid of the tint. *Id.* ¶ 34. Huynh did not actually see any of the money during this time. *Id.* ¶ 35. Mbonke and Massenya told Huynh that they would allow him to hold onto his money and the white paper money for the time being. *Id.* ¶ 35. Massenya and Huynh went to purchase two safes from a Staples supply store, which Massenya and Mbonke said they would use to store the money. *Id.* ¶ 37. Massenya and Mbonke told Huynh that Huynh could keep the safe and the money while Mbonke traveled to Paris to retrieve the necessary chemicals, and Mbonke would hold onto the combination and the keys. *Id.* ¶¶ 38–40.

Massenya and Mbonke told Huynh that the chemicals would cost an additional $250,000, of which Mbonke and Massenya would pay $170,000, ECF No. 1 ¶ 42–43, and Huynh would need to pay the remaining $80,000. *Id.* ¶ 44. Huynh agreed to take out the cash. *See id.* ¶ 49. According to Plaintiff, Mbonke then arranged a meeting between Massenya, Huynh, and an

3

"agent from a Canadian chemical company." *Id.* ¶ 45. On July 10, 2011, Massenya and Huynh went to Reagan National Airport in Crystal City, Virginia to meet the agent. *Id.* ¶ 46. Massenya went inside the airport to get the "Canadian chemical agent," and brought him back out to the car where Huynh was waiting. *Id.* ¶ 48. Massenya, Huynh, and the agent discussed the cost of the chemicals for approximately ten minutes, and Huynh then transferred his $80,000 into the agent's backpack. *Id.* ¶ 49. Plaintiff Huynh believes the identity of the Canadian chemical agent to actually be Defendant LeGrand, who had visited the Jaguar dealership the year prior. *Id.* ¶ 50.

Several days later, Mbonke called Huynh and said that the chemical company had received part of the funds for the chemicals, and that Mbonke would return from Paris and drive to Canada with the rest of the funds. ECF No. 1 ¶ 51. However, on July 16, 2011, Mbonke called again and told Huynh that while Mbonke was driving from the United States to Canada, he was pulled over for speeding. *Id.* ¶ 52. Mbonke said that he was detained for 48 hours, that U.S. Customs had confiscated all the money and chemicals, and that Mbonke had been sent back to France, forbidden from returning to the United States for at least six months. *Id.* ¶ 52. Mbonke asked Huynh to inform Massenya of what had happened. *Id.* ¶ 53. Huynh met with Massenya one more time on July 20, 2011. *Id.* ¶ 54. While Mbonke and Massenya have allegedly maintained telephone contact with Huynh, Huynh has never seen them again. *Id.* ¶ 56.

Huynh filed the instant Complaint on May 19, 2014 against the Gabonese Republic, Kodzo Massenya, Charles Mbonke, and Jean LeGrand, alleging conversion, fraud, and civil conspiracy. ECF No. 1. Defendant Massenya was served on September 9, 2014, but was the only Defendant upon whom service was effectuated. ECF No. 10. None of the Defendants has entered an appearance in this matter. Upon a motion from the Plaintiff, ECF No. 11, the Clerk entered default as to Defendant Massenya on January 9, 2015, ECF No. 12. Plaintiff moved for default

judgment against Defendant Massenya on January 12, 2015, but the Court denied the Motion pursuant to Fed. R. Civ. P. 54(b), which governs judgment against multiple defendants. ECF No. 18. The Court determined that it would be improper and risk inconsistent judgments to grant default judgment against one Defendant before the other Defendants were served and the matter adjudicated as to all Defendants. *Id.* at 2.[2] On August 4, 2017, this Court dismissed Gabon as a defendant, ECF No. 36, and on August 11, 2017, Huynh voluntarily dismissed Mbonke and Legrand as defendants, ECF No. 37. With Massenya being the sole remaining defendant, Huynh renewed his Motion for Default Judgment on August 18, 2017. ECF No. 39.

## II. STANDARD OF REVIEW

"When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). "A defendant's default does not automatically entitle the plaintiff to entry of a default judgment; rather, that decision is left to the discretion of the court." *Educ. Credit Mgmt. Corp. v. Optimum Welding*, 285 F.R.D. 371, 373 (D. Md. 2012). Although "[t]he Fourth Circuit has a 'strong policy' that 'cases be decided on their merits,'" *Choice Hotels Intern., Inc. v. Savannah Shakti Carp.*, No. DKC-11-0438, 2011 WL 5118328 at *2 (D. Md. Oct. 25, 2011) (citing *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 453 (4th Cir. 1993)), "default judgment may be appropriate when the adversary process has been halted because of an essentially unresponsive party[.]" *Id.* (citing *S.E.C. v. Lawbaugh*, 359 F. Supp. 2d 418, 421 (D. Md. 2005)).

"Upon default, the well-pled allegations in a complaint as to liability are taken as true, although the allegations as to damages are not." *Lawbaugh*, 359 F. Supp. 2d at 422. Thus, the

---

[2] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

5

court first determines whether the unchallenged factual allegations constitute a legitimate cause of action. *Agora Fin., LLC v. Samler*, 725 F. Supp. 2d 491, 494 (D. Md. 2010). In determining whether the factual allegations constitute a legitimate cause of action, courts typically apply the *Iqbal/Twombly* pleading standard. *See Baltimore Line Handling Co. v. Brophy*, 771 F. Supp. 2d 531, 544 (D. Md. 2011) (finding *Iqbal* "relevant to the default judgment inquiry"). Under *Iqbal*, a complaint fails to state a claim entitling the pleader to relief if the complaint offers only "'labels and conclusions'" or "'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007)). As the Fourth Circuit has recognized, "'the court need not accept the legal conclusions drawn from the facts, and [ ] need not accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Monroe v. City of Charlottesville*, 579 F.3d 380, 385–86 (4th Cir.2009) (citation omitted), *cert. denied*, 559 U.S. 992 (2010); *accord Simmons v. United Mortg. & Loan Investment, LLC*, 634 F.3d 754, 768 (4th Cir. 2011). Indeed, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 129 S.Ct. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)). In cases alleging fraud, "a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Hess v. Kafka*, 221 F. Supp. 3d 669, 675 (D. Md. 2016) (quoting Fed. R. Civ. P. 9(b)).

If liability is established, the court then makes an independent determination of damages. *Agora Financial, LLC*, 725 F. Supp. 2d at 494. Fed. R. Civ. P. 54(c) limits the type of judgment that may be entered based on a party's default: "A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." In entering default judgment, a court

cannot, therefore, award additional damages "because the defendant could not reasonably have expected that his damages would exceed th[e] amount [pled in the complaint]." *In re Genesys Data Techs., Inc.*, 204 F.3d 124, 132 (4th Cir. 2000). While the Court may hold a hearing to prove damages, it is not required to do so; it may rely instead on "detailed affidavits or documentary evidence to determine the appropriate sum." *Adkins*, 180 F. Supp. 2d at 17 (citing *United Artists Corp. v. Freeman*, 605 F.2d 854, 857 (5th Cir. 1979)); *see also Laborers' District Council Pension, et al. v. E.G.S., Inc.*, No. WDQ-09-3174, 2010 WL 1568595, at *3 (D. Md. Apr. 16, 2010) ("[O]n default judgment, the Court may only award damages without a hearing if the record supports the damages requested.").

## III. ANALYSIS

### A. Liability

Huynh alleges causes of Conversion, Fraud, and Civil Conspiracy against Massenya. ECF No. 1 at 11–13. The Court examines each claim in turn to assess whether Huynh has sufficiently pleaded liability such that he is entitled to default judgment.

#### 1. Conversion

In Maryland, "[c]onversion is an intentional tort, consisting of two elements, a physical act combined with a certain state of mind." *Darcars Motors of Silver Spring, Inc. v. Borzym*, 841 A.2d 828, 835 (Md. 2004). "Conversion has been defined as any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it." *Brass Metal Prod., Inc. v. E-J Enterprises, Inc.*, 984 A.2d 361, 378 (Md. Ct. Spec. App. 2009) (internal quotations omitted). "Conversion evolved from trover, which occurred where a defendant, a 'finder of lost goods[,] ... refused to return them' to the plaintiff, the owner of the goods." *Thompson v. UBS Fin. Servs.*, 115 A.3d 125 (Md. 2015) (alterations in

7

original) (quoting *Lawson v. Commonwealth Land Title Ins. Co.*, 518 A.2d 174 (Md. Ct. Spec. App. 1986)). "[T]he action and the tort have expanded beyond the case of lost goods and cover now nearly any wrongful exercise of dominion by one person over the personal property of another . . . ." *Lawson*, 518 A.2d 174. Historically, the tort of conversion was limited to tangible property, but over the years has been broadened to include intangible property, so long as "the defendant converts a document that embodies the plaintiff's right to the plaintiff's intangible property," such as a "stock certificate, a promissory note, or a document that embodies the right to a life insurance policy." *Thompson*, 115 A.3d 125 (citations omitted).

In Maryland, "[a]s a general rule, money, i.e., currency, is not subject to a claim of conversion unless the plaintiff seeks to recover specific segregated or identifiable funds." *Darcars* 841 A.2d at 834 (2004). An action for conversion of cash is only sufficient if there is specifically "earmarked" or identified currency which the plaintiff is entitled to. *Id. See also Lawson*, 518 A.2d 174 ("a conversion action is not maintainable for money unless there be an obligation on the part of the defendant to return the specific money entrusted to his care; otherwise, there is only a relationship of debtor or creditor, and a conversion action will not lie against the debtor" (citations and internal quotation marks omitted)). One reason for the rule is that money is often commingled: "if a defendant maintains possession of the proceeds in question, but commingles it with other monies, the cash loses its specific identity," and thus would be considered intangible property. *Allied Investment Corp. v. Jasen*, 731 A.2d 957 (1999).

Here, even assuming all the facts in the Complaint as true, Huynh has not pleaded that Massenya is liable to him for the tort of conversion. In his Complaint, Huynh states, without explanation, that "Massenya, Mbonke, and LeGrand have exercised and continue to exercise

8

dominion and control over property rightfully belonging to Plaintiff by not returning his $880,000." ECF No. 1 ¶ 60.

First, the Court notes that there are two sums of money at issue here: the $800,000 that Huynh temporarily gave to Mbonke and Massenya for the "white money transformation," *id.* ¶ 28, and the $80,000 that Huynh subsequently gave to LaGrand for the purchase of additional chemicals, *Id.* ¶ 49. Second, the Court notes that, even assuming the facts in the Complaint as true, Massenya never had control over Huynh's $880,000. According to the Complaint, the $800,000 was wrapped in aluminum foil, put in "two Sentry Safes" and left with Huynh; Mbonke held on to the "combination and keys to the safes." *Id.* ¶¶ 35–38. Nowhere in the Complaint does Huynh plead that the $800,000 was not actually in the safes. As such, the Court's understanding is that Huynh has the Sentry Safes, but cannot open them because Mbonke possesses the combinations and keys for the safes. Assuming all these facts are true, Huynh has not alleged that Massenya has refused to return Huynh's $800,000, and therefore has not stated a claim of conversion against him. As for the $80,000, this sum was apparently received by a "chemical company" in Canada. *Id.* ¶ 51. Huynh has not alleged that Massenya has control over the $80,000, or that he refuses to return it to Huynh, and has not stated a claim of conversion for the $80,000.

Even if Huynh had stated that Massenya is depriving him of his $880,000, the Court finds that under Maryland law, Huynh would still not have a valid cause of action for conversion, as he does not allege that he is entitled to specifically "earmarked" or identified currency. In his Complaint, Huynh essentially alleges that he entered into a contract with Massenya and Mbonke; that Huynh would provide $880,000 and that Massenya and Mbonke would "pay . . . Huynh for his land with the 'white paper' money." *Id.* ¶ 24. The transformation of the "white paper" money

was unsuccessful, and Huynh now seeks the return of his initial cash. However, based on the facts alleged in the Complaint, Huynh was not entitled to the return of the specific cash that he provided to Massenya and Mbonke. As such, under Maryland law, he does not have a claim for conversion of the cash.

### 2. Fraud

In order to recover damages in an action for fraud or deceit in Maryland, "a plaintiff must prove (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation." *Ellerin v. Fairfax Sav., F.S.B.*, 652 A.2d 1117, 1123 (Md. 1995). "[R]ecovery in a tort action for fraud or deceit in Maryland is based upon a defendant's deliberate intent to deceive." *Id.* at 1124. *See also F Corp. v. Wrexham Aviation Corp.*, 715 A.2d 188, 193 (Md. 1998). To plead this level of intent, "[t]he plaintiff in an action of fraud or deceit must prove that the defendant either knew that the representation was false or made the representation with 'reckless indifference' as to its truth." *Ellerin v. Fairfax Sav., F.S.B.*, 652 A.2d 1117, 1124 (Md. 1995).

Huynh alleges that Massenya "falsely represented to [Huynh]" that the white paper transformation process "was both legal and designed to serve the legal ends of purchasing Plaintiff's property," ECF No. 1 at 12, and that he knew that this was a false representation, *id.* at 13. Huynh pleads with specificity the circumstances of this fraudulent statement: the statement was made by Massenya on January 19, 2011 at the Bethesda Marriott Suites in Bethesda, Maryland. *Id.* ¶¶ 19–20. Huynh further alleges that he relied on these statements, which caused

him to lose $880,000. *Id.* The Court finds that Huynh has sufficiently pleaded the elements of fraud under Maryland law.

### 3. Civil Conspiracy

In Maryland, "a civil conspiracy is a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or means employed must result in damages to the plaintiff." *BEP, Inc. v. Atkinson,* 174 F.Supp.2d 400, 408 (D.Md.2001) (citing *Green v. Washington Sub. San. Comm'n,* 269 A.2d 815, 824 (1970)). A clear agreement to conspire is necessary because the "[i]ndependent acts of two wrongdoers do not make a conspiracy." *Murdaugh Volkswagen, Inc. v. First Nat. Bank of South Carolina,* 639 F.2d 1073, 1076 (4th Cir.1981). The conspired unlawful act does not have to be criminal, but requires "the violation of a legal right committed knowingly to create a cause of action." *BEP,* 174 F.Supp.2d at 409 (citing *Columbia Real Estate Title Ins. Co. v. Caruso,* 39 Md.App. 282, 384 A.2d 468, 472 (1978)). Conspiracy is not a tort on its own, but is dependent on some underlying tort that caused injury to the plaintiff. *Estate of White,* 109 F.Supp.2d at 428 (citing *Alexander & Alexander, Inc. v. B. Dixon Evander & Assoc.,* 336 Md. 635, 650 A.2d 260, 265 n. 8 (1994)). Indeed, in Maryland "it is 'improper pleading to allege . . . conspiracy in [a] separate count [ ].'" *Seneca One Fin., Inc. v. Bloshuk,* 214 F. Supp. 3d 457, 466 (D. Md. 2016) (quoting *Manikhi v. Mass Transit Admin.,* 758 A.2d 95, 110 n.6 (Md. 2000)). Under Maryland law, "civil conspiracy provides a means of holding a co-conspirator liable for acts committed in furtherance of the conspiracy by another member"; however, "the agreement itself is not actionable." *Woods v. Stewart Title Guar. Co.,* No. CIV. CCB-06-0705, 2006 WL 2135518, at *4 (D. Md. July 28, 2006).

11

Here, the Court declines to grant default judgment on Huynh's claim for Civil Conspiracy. Although the Court finds that Huynh has pleaded that a conspiracy occurred, a claim for Civil Conspiracy cannot stand as an independent cause of action. Huynh does not seek to hold Massenya liable for the acts of his co-conspirators; he seeks to hold Massenya liable for the fraud that Massenya directly perpetrated on Hunyh.

**B. Damages**

Having granted Huynh default judgment on his cause of action for fraud, the Court must now make an independent determination of damages. *See Agora Fin., LLC*, 725 F. Supp. 2d at 494. When ruling on a motion for default judgment, "[p]roceeding without a hearing is the exception"; yet, the court may award damages without a hearing if "the record supports the damages requested," such as through comprehensive, detailed, and uncontroverted exhibit and affidavit evidence establishing the amount of damages. *Baltimore Line Handling Co. v. Brophy*, 771 F. Supp. 2d 531, 541 (D. Md. 2011). *See also Monge v. Portofino Ristorante*, 751 F.Supp.2d 789, 794 (D.Md.2010) (citing, *inter alia, Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir.1992); *Virgin Records Am., Inc. v. Lacey*, 510 F.Supp.2d 588, 593 (S.D.Ala.2007); *U2 Home Entm't, Inc. v. Fu Shun Wang*, 482 F.Supp.2d 314, 318 (E.D.N.Y.2007)). *See Stephenson v. El–Batrawi*, 524 F.3d 907, 917 n. 11 (8th Cir.2008) ("Foregoing an evidentiary hearing may constitute abuse of discretion when the existing record is insufficient to make necessary findings in support of a default judgment."); *see also* 10A Wright, Miller, § 2688, at 57–58, 63–70.

The Court finds the evidentiary record to be insufficient to make an independent determination of damages. Huynh has not provided any exhibits or affidavits which support his claim for damages. It is unclear from the Complaint whether Mr. Huynh's initial $800,000 is

currently in two safes in his possession, or whether it is possessed by Mr. Massenya or his co-conspirators. It is further unclear who currently has possession of Mr. Huynh's $80,000: whether that money was in fact seized by government authorities, or whether it is possessed by Mr. Massenya or his co-conspirators. As such, while the Court will grant a default judgment against Massenya, the Court declines to make a determination of damages, and will schedule an evidentiary hearing.

### IV. CONCLUSION

For the foregoing reasons, Plaintiff's Renewed Motion for Default Judgment, ECF No. 39, is granted in part and denied in part. Plaintiff's Motion for Clerk's Entry of Default, ECF No. 35, is denied as moot, as the Clerk previously made an Entry of Default for Massenya on January 9, 2015, ECF No. 11. The Court will schedule an evidentiary hearing to determine damages and reasonable attorney's fees. A separate Order follows.

Date: <u>November 13, 2017</u>

GEORGE J. HAZEL
United States District Judge