IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

2018 FEB 26 A 10: 16

JAMES HUYNH,

    Plaintiff,

v.                                       Case No.: GJH-14-1625

KODZO MASSENYA, *et al.*,

    Defendants.

## MEMORANDUM OPINION

Plaintiff James Huynh brought this action against the Gabonese Republic ("Gabon") and three individuals, Kodzo "Michael" Massenya, Charles Mbonke, and Jean LeGrand, for conversion, fraud, and civil conspiracy. ECF No. 1. Since then, this Court dismissed Gabon as a defendant, ECF No. 36 ¶ 2, and Huynh voluntarily dismissed Mbonke and LeGrand as defendants, ECF No. 37. In its November 2017 Memorandum Opinion, the Court granted Plaintiff partial default judgment on his claim for fraud or deceit, but did not rule on the amount of damages he was entitled to. ECF No. 40. Presently pending before the Court is Plaintiff's Motion to Determine Damages Without a Hearing, ECF No. 44. Having reviewed this additional submission, the Court has determined that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2016). For the following reasons, the Motion is granted-in-part.

## I. BACKGROUND[1]

The Court laid out the facts of this case in its May 30, 2017 and November 13, 2017 Memorandum Opinions, ECF No. 33, ECF No. 40, but restates the relevant facts here. Huynh is

---

[1] The background facts are taken from Plaintiff's Complaint, ECF No. 1, and documents submitted by Plaintiff along with his Motion to Determine Damages Without a Hearing, ECF No. 44.

a Virginia resident and at all times relevant to the action owned approximately four acres of land in Fairfax, Virginia. ECF No. 1 ¶¶ 1, 8. Huynh was working at a Jaguar and Land Rover/Range Rover car dealership in Rockville, Maryland in January 2010, when he met Defendant Jean LeGrand. *Id.* ¶ 10. LeGrand visited the Jaguar dealership approximately fifteen times between January 2010 and October 2010, purchasing two vehicles during that time. *Id.* ¶¶ 10–11. In August 2010, Huynh also met Defendant Kodzo Massenya when Massenya visited the dealership. *Id.* ¶ 12. To the best of Plaintiff's knowledge and belief, Massenya is a resident of the United Kingdom. *Id.* ¶ 4. Massenya represented that he was wealthy and expressed interest in Huynh's Fairfax land. *Id.* ¶ 13. Massenya told Huynh that he knew someone from Gabon — the son of the late President of Gabon, in particular — who would be interested in purchasing Huynh's land. *Id.* ¶ 14. On or about January 3, 2011, Massenya introduced Huynh to Defendant Charles Mbonke at the Bethesda Marriott Suites in Bethesda, Maryland. *Id.* ¶ 15. To the best of Plaintiff's knowledge and belief, Mbonke is a resident of Gabon and/or France. *Id.* ¶ 5. Mbonke introduced himself to Huynh as the son of the late Gabonese President, Omar Bongo Ondimba. *Id.* ¶ 16. According to Plaintiff, Mbonke also stated that he was working on behalf of the government of the Gabonese Republic and serving as a Delegate from Gabon to the United Nations. *Id.* ¶¶ 17–18. Mbonke allegedly showed Huynh what appeared to be a diplomatic passport from the Gabonese Republic in Mbonke's name. *Id.* ¶ 18. Huynh found Mbonke to be "well-spoken, well-dressed and politically informed." *Id.* ¶ 16.

Huynh again met Defendants Mbonke and Massenya at the Bethesda Marriott on January 19, 2011. ECF No. 1 ¶ 19. During this meeting, Mbonke allegedly told Huynh how money could be "legally printed" using "specially-produced white paper" from the United States Treasury and specific chemicals. *Id.* ¶ 20. Mbonke and Massenya told Huynh that this special white paper was

2

transported from the U.S. Treasury to the government of Gabon, and that this process was "officially sanctioned" by both governments. *Id.* ¶ 21. Mbonke said that he had some of this white paper in his possession, with authorization from the Gabonese government to use it. *See id.* ¶ 22. Mbonke and Massenya allegedly demonstrated to Huynh how they could turn the white paper into bona fide U.S. currency. *Id.* ¶ 23. Mbonke and Massenya asked Huynh for $800,000, which they would use to convert the white paper, double his sum of $800,000, and pay Huynh for his land. *See id.* ¶ 24. Huynh agreed, and withdrew $800,000 from his bank account on May 16, 2011. *Id.* ¶ 25. Huynh gave Mbonke and Massenya $500,000 of the funds, and turned over the remaining $300,000 soon thereafter. *Id.* ¶¶ 27–31.

On May 19, 2011, Huynh went with Mbonke and Massenya to a residence in Laurel, Maryland, which Massenya represented to be Massenya's uncle's house. ECF No. 1 ¶ 30. Mbonke and Massenya told Huynh they were going to turn the white paper into real money, and instructed him to wait in another room. *Id.* ¶ 33. Eventually, Mbonke and Massenya told Huynh that the white paper had a undesirable pinkish tint on it, and that they would need additional chemicals to get rid of the tint. *Id.* ¶ 34. Huynh did not actually see any of the money during this time. *Id.* ¶ 35. Mbonke and Massenya told Huynh that they would allow him to hold onto his money and the white paper money for the time being. *Id.* ¶ 35. Massenya and Huynh went to purchase two safes from a Staples supply store, which Massenya and Mbonke said they would use to store the money. *Id.* ¶ 37. Massenya and Mbonke told Huynh that Huynh could keep the safe and the money while Mbonke traveled to Paris to retrieve the necessary chemicals, and Mbonke would hold onto the combination and the keys. *Id.* ¶¶ 38–40.

Massenya and Mbonke told Huynh that the chemicals would cost an additional $250,000, of which Mbonke and Massenya would pay $170,000, ECF No. 1 ¶ 42–43, and Huynh would

3

need to pay the remaining $80,000. *Id.* ¶ 44. Huynh agreed to take out the cash. *See id.* ¶ 49. According to Plaintiff, Mbonke then arranged a meeting between Massenya, Huynh, and an "agent from a Canadian chemical company." *Id.* ¶ 45. On July 10, 2011, Massenya and Huynh went to Reagan National Airport in Crystal City, Virginia to meet the agent. *Id.* ¶ 46. Massenya went inside the airport to get the "Canadian chemical agent," and brought him back out to the car where Huynh was waiting. *Id.* ¶ 48. Massenya, Huynh, and the agent discussed the cost of the chemicals for approximately ten minutes, and Huynh then transferred his $80,000 into the agent's backpack. *Id.* ¶ 49. Plaintiff Huynh believes the identity of the Canadian chemical agent to actually be Defendant LeGrand, who had visited the Jaguar dealership the year prior. *Id.* ¶ 50.

Several days later, Mbonke called Huynh and said that the chemical company had received part of the funds for the chemicals, and that Mbonke would return from Paris and drive to Canada with the rest of the funds. ECF No. 1 ¶ 51. However, on July 16, 2011, Mbonke called again and told Huynh that while Mbonke was driving from the United States to Canada, he was pulled over for speeding. *Id.* ¶ 52. Mbonke said that he was detained for 48 hours, that U.S. Customs had confiscated all the money and chemicals, and that Mbonke had been sent back to France, forbidden from returning to the United States for at least six months. *Id.* ¶ 52. Mbonke asked Huynh to inform Massenya of what had happened. *Id.* ¶ 53. Huynh met with Massenya one more time on July 20, 2011. *Id.* ¶ 54. While Mbonke and Massenya have allegedly maintained telephone contact with Huynh, Huynh has never seen them again. *Id.* ¶ 56.

Huynh filed the instant Complaint on May 19, 2014 against the Gabonese Republic, Kodzo Massenya, Charles Mbonke, and Jean LeGrand, alleging conversion, fraud, and civil conspiracy. ECF No. 1. Defendant Massenya was served on September 9, 2014, but was the only Defendant upon whom service was effectuated. ECF No. 10. None of the Defendants has entered

4

an appearance in this matter. Upon a motion from the Plaintiff, ECF No. 11, the Clerk entered default as to Defendant Massenya on January 9, 2015, ECF No. 12. Plaintiff moved for default judgment against Defendant Massenya on January 12, 2015, but the Court denied the Motion pursuant to Fed. R. Civ. P. 54(b), which governs judgment against multiple defendants. ECF No. 18. The Court determined that it would be improper and risk inconsistent judgments to grant default judgment against one Defendant before the other Defendants were served and the matter adjudicated as to all Defendants. *Id.* at 2.[2] On August 4, 2017, this Court dismissed Gabon as a defendant, ECF No. 36, and on August 11, 2017, Huynh voluntarily dismissed Mbonke and Legrand as defendants, ECF No. 37. With Massenya being the sole remaining defendant, Huynh renewed his Motion for Default Judgment on August 18, 2017. ECF No. 39. On November 13, 2017, this Court granted-in-part and denied-in-part Plaintiff's Motion for Default Judgment. ECF No. 40. The Court found that, accepting the unchallenged allegations as true, Plaintiff had demonstrated that Defendants were liable for fraud or deceit,[3] but he had not presented sufficient evidence for the Court to calculate the damages to which Plaintiff was entitled. ECF No. 40 at 12. Specifically, the Court noted that it was not clear "whether Mr. Huynh's initial $800,000 is currently in two safes in his possession, or whether it is possessed by Mr. Massenya or his co-conspirators. It is further unclear who currently has possession of Mr. Huynh's $80,000: whether that money was in fact seized by government authorities, or whether it is possessed by Mr. Massenya or his co-conspirators." *Id.* at 12–13. The Court scheduled an evidentiary hearing to determine these facts. ECF No. 42.

---

[2] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.
[3] The Court found that Defendants were not liable under Plaintiff's other two causes of action: conversion and civil conspiracy. ECF No. 40 at 7–12.

5

On January 31, 2018, Plaintiff filed the now-pending Motion to Determine Damages Without a Hearing, along with Plaintiff's affidavit and supporting documentation. ECF No. 44, ECF No. 44-1. Huynh clarifies that "[f]rom May 19, 2011 until January 10, 2018" the safes, which purportedly contained $800,000, "remained locked and unopened in my possession." ECF No. 44-1 at 3. On January 10, 2018, Plaintiff took the safes to a locksmith who, in the presence of Plaintiff, his attorney, and a videographer, opened the safes. *Id.* Plaintiff's $800,000 was not in the safes; rather, the safes contained "25 packages wrapped in aluminum foil and duct tape . . . containing only stacks of white paper, with many discolored from age and possible chemicals." *Id.* at 3–4. Plaintiff further states that he reported the loss of his $880,000 to the United States Government, and was not informed that the $80,000 were seized by the government. *Id.* at 4.

## II. STANDARD OF REVIEW

"When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). "A defendant's default does not automatically entitle the plaintiff to entry of a default judgment; rather, that decision is left to the discretion of the court." *Educ. Credit Mgmt. Corp. v. Optimum Welding*, 285 F.R.D. 371, 373 (D. Md. 2012). Although "[t]he Fourth Circuit has a 'strong policy' that 'cases be decided on their merits,'" *Choice Hotels Intern., Inc. v. Savannah Shakti Carp.*, No. DKC-11-0438, 2011 WL 5118328 at *2 (D. Md. Oct. 25, 2011) (citing *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 453 (4th Cir. 1993)), "default judgment may be appropriate when the adversary process has been halted because of an essentially unresponsive party[.]" *Id.* (citing *S.E.C. v. Lawbaugh*, 359 F. Supp. 2d 418, 421 (D. Md. 2005)).

6

The Court has previously determined that Defendants are liable for fraud or deceit. ECF No. 40 at 10. Once a court establishes liability in a default judgment case, the court then makes an independent determination of damages. *Agora Financial, LLC*, 725 F. Supp. 2d at 494. Fed. R. Civ. P. 54(c) limits the type of judgment that may be entered based on a party's default: "A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." In entering default judgment, a court cannot, therefore, award additional damages "because the defendant could not reasonably have expected that his damages would exceed th[e] amount [pled in the complaint]." *In re Genesys Data Techs., Inc.*, 204 F.3d 124, 132 (4th Cir. 2000). While the Court may hold a hearing to prove damages, it is not required to do so; it may rely instead on "detailed affidavits or documentary evidence to determine the appropriate sum." *Adkins*, 180 F. Supp. 2d at 17 (citing *United Artists Corp. v. Freeman*, 605 F.2d 854, 857 (5th Cir. 1979)); *see also Laborers' District Council Pension, et al. v. E.G.S., Inc.*, No. WDQ-09-3174, 2010 WL 1568595, at *3 (D. Md. Apr. 16, 2010) ("[O]n default judgment, the Court may only award damages without a hearing if the record supports the damages requested.").

### III. ANALYSIS

In its November Memorandum Opinion, the Court found:

> the evidentiary record to be insufficient to make an independent determination of damages. Huynh has not provided any exhibits or affidavits which support his claim for damages. It is unclear from the Complaint whether Mr. Huynh's initial $800,000 is currently in two safes in his possession, or whether it is possessed by Mr. Massenya or his co-conspirators. It is further unclear who currently has possession of Mr. Huynh's $80,000: whether that money was in fact seized by government authorities, or whether it is possessed by Mr. Massenya or his co-conspirators.

ECF No. 40 at 12–13.

The affidavits and supporting documentation provided by Plaintiff with his Motion to Determine Damages Without a Hearing has clarified these evidentiary questions. As attested by

Plaintiff, his attorney, and a locksmith, Plaintiff took the two safes, which purportedly contained his $800,000, to a locksmith on January 10, 2018. ECF No. 44-1 at 3, 26, 53. The safes were opened, and contained only 25 bundles of blank paper, wrapped in aluminum foil and duct tape. *Id.* Furthermore, Plaintiff reached out to the U.S. Government and reported his loss of the $880,000; he was not informed that the government had seized the $80,000, as Defendants told Plaintiff had occurred. *Id.* at 4. Furthermore, Plaintiff presents bank records that indicate that in May 2011, he withdrew $800,500 from a business that he controlled. *Id.* at 24. Plaintiff asserts that since he gave the $880,000 to Defendants, he has not had "possession or access to or control over any of the currency," and Defendants have not "made any effort or taken any steps to return the aforesaid monies to me." *Id.* at 4. Based on the totality of the evidence presented by Plaintiff, the Court finds that he suffered damages in the amount of $880,000.

Regarding attorney's fees, Plaintiff seeks reasonable attorney's fees for the cost of bringing his claim, but does not state why he is entitled to such fees. *See* ECF No. 44 at 4. Unless the winning party can point to some exception, such as a contractual or statutory provision, "[i]n the United States, parties are ordinarily required to bear their own attorney's fees—the prevailing party is not entitled to collect from the loser." *Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Human Res.*, 532 U.S. 598, 602 (2001). Plaintiff has not pointed to any contractual or statutory provision that permits his recovery of attorney's fees from Defendants. Maryland courts have previously awarded attorney's fees where the defendant's conduct involved "gross fraud" "practiced willfully and oppressively upon untutored trusting victims," *Empire Realty Co. Inc. v. Fleisher*, 269 Md. 278, 288 (1973); here, however, Plaintiff has not raised such an argument. As this issue has not been directly briefed, Plaintiff may submit additional briefing regarding its entitlement to attorney's fees within the next fourteen days.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Determine Damages Without a Hearing, ECF No. 44, is granted as to Plaintiff's actual damages. Regarding his request for attorney's fees, within fourteen days of the date of this Memorandum Opinion, Plaintiff may submit additional briefing regarding his entitlement to attorney's fees and their amount. A separate Order follows.

Date: February 23, 2018

GEORGE J. HAZEL
United States District Judge